UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,

     - against -                                        23 Cr. 00568 (PKC)

DOUGLAS RAYMOND ARNTSEN,

            Defendant.

-------------------------------------------------------X

## SENTENCING MEMORANDUM
## ON BEHALF OF DOUGLAS RAYMOND ARNTSEN

Dated: New York, New York
       April 18, 2024

                     Aaron M. Rubin, Esq.

                     99 Wall Street Suite 1130
                     New York, New York 10005
                     Tel.: (212) 725 - 4600
                     arubin@amresquire.com
                     *Counsel for Douglas Raymond Arntsen*

# TABLE OF CONTENTS

**I.** PRELIMINARY STATEMENT.........................................................................................................1

**II**. MR. ARNTSEN'S DETERMINATION TO ACCEPT RESPONSIBILITY FOR HIS ACTIONS AND PURSUE REHABILITATION, AND HIS STRONG SOCIAL NETWORK OF SUPPORT, DEMONSTRATE SINCERE REMORSE AND A PROMISING FUTURE.................................................................................................................8

**III.** MR. ARNTSEN'S PAST TRAUMA AND SUBSTANCE ABUSE ARE FURTHER MITIGATING FACTORS TO BE CONSIDERED FOR HIS SENTENCING. ........................................13

**IV.** MR. ARNTSEN'S SENTENCING SHOULD BE IMPOSED IN CONSIDERATION OF SENTENCES FOR COMPARABLE COVID FINANCIAL FRAUD WITHIN THE SECOND CIRCUIT AND NATIONWIDE. .......................................................................................17

**V.** CONCLUSION. ........................................................................................................................23

## I.  **PRELIMINARY STATEMENT**

This memorandum and its attached exhibits are respectfully submitted in the hopes of assisting the Court in formulating an appropriate sentence for Douglas Arntsen for his plea pursuant to an agreement to one count of conspiracy to commit wire fraud with a loss amount of 1.5 million dollars.

We acknowledge the sentencing challenges Mr. Arntsen faces as a second offender, but Mr. Arntsen has sought at every turn since his arrest to demonstrate his sincere and complete acceptance of responsibility for his actions, which is the reason he pled guilty just five weeks after his arraignment, and additionally agreed to a full restitution order in the amount of $1,430,200.  From the outset of this case, Mr. Arntsen proceeded to devote his time and resources to rehabilitative efforts rather than litigation, and wasted no time preparing for his sentencing and exploring his deep remorse for his damaging missteps in judgment.  In his annexed letter to the Court, Mr. Arntsen writes:

> In the summer of 2020, amidst the uncertainty and pressures of the pandemic, I orchestrated a scheme involving fraudulent loan applications. This was legally indefensible and morally wrong . . . Recognizing my role in involving others in wrongdoing has only intensified my remorse. I am determined to make things right and ensure that my future choices reflect the lessons I've learned.[1]

Those who know him best, especially his close family and friends, insist that his serious failures are a departure from his true character: which is that of a loving father capable of showing genuine kindness and generosity to those around him while engaging in meaningful and caring relationships.  Their disappointment in Mr. Arntsen and his present circumstances are certainly profound, but as evidenced by their annexed

---

[1] Exhibit A: Letter by Douglas Arntsen.

letters to the Court, there is little question they remain in his corner as a real source of support and encouragement for now and into the future.

Mr. Arntsen, who is 46 years old and a life-long New Yorker, has never wavered in his commitment to his family and his only daughter Sienna, who will graduate high school next month and head to college in a moment they planned to spend together in celebration instead of a courtroom. In her letter to Your Honor in support of her father, Sienna writes, "My dad is incredibly important to me. I do not understand fully what led him to be here. But it is not the Dad that I know."[2]

This sentencing memorandum on behalf of Mr. Arntsen seeks to provide the context as to how a devoted father who clearly demonstrates genuine empathy for his family and community on the one hand, could have succumbed to temptations of greed and excess in times of desperation.

In providing the context for Mr. Arntsen's transgressions, we not only discuss his strong social network of the aforementioned familial support, but also his personal challenges consisting of the serious and unresolved trauma he sustained from his prior incarceration in a harsh state prison and his ensuing difficulties of reintegrating into society, in addition to his struggles with anxiety and alcohol that have unfortunately gone unaddressed for far too long, which undoubtedly contributed to dimming his ability to embrace good judgment during times of duress.

For these purposes, we retained Dr. Alexander Bardey, a forensic psychiatrist, to interview Mr. Arntsen and various family members over a period of numerous counseling sessions in order to perform an in-depth analysis of Mr. Arntsen's life to gain a better understanding of the relevant psychological factors that may

---

[2] Exhibit B: Letter by Sienna.

contextualize his conduct and provide mitigating factors to be considered for sentencing. Dr. Bardey's report is attached hereto as Exhibit C, and discusses, among other things, how "the psychological impact of Mr. Arntsen's initial incarceration was profound, as his self-identity and self -confidence were shattered."[3]

As discussed more fully in Dr. Bardey's report, Mr. Arntsen's prior three and half years of prison, rather than provide an opportunity at rehabilitation or a lasting life lesson, caused him instead a major setback that opened more unresolved issues than it closed.  Mr. Arntsen's drinking habit increased, and his continuing struggle to re-establish himself both financially and socially after incarceration greatly contributed to a generalized sense of anxiety and panic as he struggled to find a path to provide for his family and daughter.  Needless to say, when COVID came in 2020, these challenges exacerbated.  He and his former wife, Stefanie, who were still living together and raising their only daughter, lost their sources of income, while Stefanie then lost her father to COVID, while the family was also facing the COVID death of Mr. Arntsen's grandmother.  For Mr. Arntsen, COVID was a time of financial and mental desperation, for himself and many others that he knew around him, and the Government's various emergency measures to provide economic stimulus at an unprecedented rate and scale provided an unfortunate and opportunistic outlet.  As Mr. Arntsen recalls,

> Many endured similar pressures but chose not to compromise their ethics. They faced the same uncertainties without resorting to dishonesty or exploitation. Unlike them, I misused my knowledge for personal gain, fully aware of the wrongdoing yet proceeding nonetheless thereby diverting government assistance from those small businesses entitled to such loans. I should have known better and it is an

---

[3] Exhibit C: Dr. Bardey's report, at p. 11.

understatement to say that I am greatly disappointed in myself.[4]

Upon Mr. Arntsen's arrest, he was released on terms that included home detention and GPS monitoring.  But although Mr. Arntsen has been confined to his home for the duration of these proceedings, (without incurring a single violation), he has been determined to use the time to address his alcoholism in a way that was meaningful and not pro forma, in regular AA sessions and ongoing discussions with Anthony Hill of Next Wind Recovery, while continuing to contribute to his community and supporting the schooling efforts of his daughter.  He also took the opportunity to engage in a process of self-reflection with Dr. Bardey.  It is this determination to account for his transgressions, while maintaining a resilient forecast, that has encouraged his network of family and friends to maintain their strong belief that he will ultimately emerge with a productive future.  We respectfully ask the Court to afford Mr. Arntsen the benefit of the doubt in this regard.

In promptly pleading guilty in this case, Mr. Arntsen has maintained a realistic expectation that his sentencing will include a meaningful term of imprisonment. In his plea agreement, he stipulated to a restitution of $1,430,200, an offense level of 30 (with a loss amount as noted in the PSR of $1,500,000) and a Criminal History Category II, which results in a Guidelines range of 108 to 135 months imprisonment.

However, we respectfully submit that the range set by the Guidelines, which are only advisory, suggest a term of imprisonment that is greater than necessary to comply with the purposes of sentencing under 18 U.S.C. § 3553, and in particular, present a meaningful disparity to the length of sentences that have been imposed by this

---

[4] Exhibit A: Letter by Douglas Arntsen.

Court when it comes to other financial fraud convictions, and by other district courts in the Southern District of New York, in the Second Circuit, and nationwide, specifically in the area of COVID related financial fraud cases.

While the United States Sentencing Guidelines may have initially been formed to address widespread disparities in sentences, it has not been uncommon for jurists to raise legitimate questions as to their effectiveness towards achieving that end. For instance, Judge Jed S. Rakoff aptly noted that "it may be worth remembering that the Sentencing Guidelines were originally designed to moderate unwarranted disparities in federal sentencing by enacting a set of complicated rules that, it was hypothesized, would cause federal judges to impose for any given crime a sentence approximately equal to what empirical data showed was the average sentence previously imposed by federal judges for that crime. From almost the outset, however, the Guidelines deviated from this goal. United States v. Gupta, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012) (citation omitted).

In this sentencing memorandum on behalf of Mr. Arntsen, we have attempted to compile relevant empirical data to determine such average sentences for the recent set of circumstances of financial fraud prosecutions posed by the COVID era. For the purpose of assisting the Court in measuring the extent of sentencing disparities for financial fraud cases, and COVID financial fraud in particular, we therefore conducted an expansive review of sentences imposed in such cases, both locally and around the country, which are set forth in more detail in Section IV below, and in the attached charts annexed hereto as Exhibits O, P & Q.

Our review began with comprising various sentences imposed by Your Honor in financial fraud cases in general (because we were unable to find any prior sentences by this Court for a conviction related specifically to COVID financial fraud). To ascertain an adequate sampling of financial fraud sentences that have taken place before this Court, we performed an anecdotal search on Google for terms consisting of "sentenced" & "Judge Castel" & "Department of Justice," and then focused on the search results that were for prosecutions in the area of wire fraud, money laundering and other financial frauds.  We were able to find a total of 26 cases in response to our search, that we then further explored through the links to their corresponding DOJ press releases, and then also searches of relevant materials on Pacer if possible (to ascertain, for instance, if such a case involved a defendant with prior convictions which would be more relevant to Mr. Arntsen's circumstances).  The terms of imprisonment for each case were then plotted on a chart, (attached hereto as Exhibit O), with the assistance of a charting website called statscharts.com, which automatically calculated a trendline representing the overall trend in the data, sometime also referred to as a "best fit line."[5]

We substantially repeated this process for cases throughout the Second Circuit and nationwide, in two additional charts contained in Exhibit P and Exhibit Q, respectively.  But for these reviews and their corresponding charts, we collected cases not anecdotally from Google, but from searches of two United States Government databases that have been established to compile COVID related financial fraud prosecutions nationwide. The two Government databases were, (1) fbi.gov/coronavirus, which lists

---

[5] The "best fit" line, or regression line, has been defined as "the line that best fits the data. In other words, [it is] the best explanation of the relationship between the independent variable and dependent variable." See "A Refresher on Regression Analysis," *Harvard Business Review*, at https://hbr.org/2015/11/a-refresher-on-regression-analysis.

Covid-related prosecutions from around the country as reported by the FBI and the various US Attorneys' offices, and (2) pandemicoversight.gov, which is a website operated by the Pandemic Response Accountability Committee overseen by, among others, the Office of the Inspector General for the Department of Justice.  From the extensive lists of cases contained in these databases, we then compiled charts of the terms of imprisonments of the sentences for only those defendants with prior convictions, or Criminal History Category II or more, or defendants who were subsequently charged with additional offenses after their indictment, which again usually required our having to search for additional case details in materials contained in the dockets of those particular cases on Pacer.

For COVID financial fraud cases involving such defendants within the district courts of the Second Circuit, we found 23 cases (Exhibit P), and for such cases nationwide, we found 190 cases (Exhibit Q).

After conducting our review, we can submit that the more applicable range for an appropriate sentence for Mr. Arntsen are the levels reflected by the trendlines on these three attached charts, as they relate to comparable loss amounts at issue in Mr. Arntsen's case. To begin, the trendline in Exhibit O, (which provides a chart of the 26 sample sentences for financial fraud imposed by this Court), averages a 52-month term of imprisonment as the sentence corresponding to loss amounts of $10,000,000 or less. However, these are not COVID related fraud cases.  In regard to COVID related fraud cases that we identified from the Government databases mentioned above for prosecutions within the Second Circuit and nationwide, we found that the trendlines calculated a significantly lower term of imprisonment, of 38 months and 44 months,

respectively, for prosecutions involving loss amounts of $1,500,000 for defendants in situations similar to Mr. Arntsen, with either (1) prior convictions, or (2) Criminal History Category II or more, or (3) defendants who were Criminal History Category I offenders but subsequently charged with additional post indictment offenses.

Accordingly, we submit that a more suitable range for this Court's consideration of Mr. Arntsen's sentence, in light of our reviews, is between 38 and 52 months, instead of the more generalized range that is proposed by the United States Sentencing Guidelines.  We further submit that within our proposed range, a term closer to 38 months imprisonment would be more reasonably proportionate to the sentences that have been imposed within the Second Circuit and nationwide, because they account for the nature of fraud that specifically took place during the highly unusual circumstances of COVID.

## II.  MR. ARNTSEN'S DETERMINATION TO ACCEPT RESPONSIBILITY FOR HIS ACTIONS AND PURSUE REHABILITATION, AND HIS STRONG SOCIAL NETWORK OF SUPPORT, DEMONSTRATE SINCERE REMORSE AND A PROMISING FUTURE

In this section we seek to address the "history and characteristics" of Mr. Arntsen that are relevant to his sentencing under 18 U.S.C. § 3553(a)(1).

In his letter to the Court, Mr. Arntsen writes that "recognizing my role in involving others in wrongdoing has only intensified my remorse. I am determined to make things right and ensure that my future choices reflect the lessons I've learned."[6] For Mr. Arntsen, the harm that his actions caused and the disappointment to his family are among his most painful realities in reflecting on his conduct.  "I also owe an apology to my family, who has suffered silently as they bear the weight of my decisions. Despite

---

[6] Exhibit A: Letter by Douglas Arntsen.

8

promising them a life of integrity after my previous conviction from 2012, I failed to keep that promise. The pain and sorrow I have caused them are immeasurable, and for that and to them, I am truly sorry."

Mr. Arntsen's incarceration will inflict a harsh price on his family, and in particular, his daughter.[7]  Upon his arrest, Mr. Arntsen quickly realized that contrary to his prior incarceration, his present circumstances this time were going to once again take him from his family.  But this time the passage of time has inevitably diminished the opportunities he has left to share memories with those dearest to him, especially his daughter Sienna, who wrote in her letter to the Court:

> My dad has always been my greatest motivator, cheerleader and confidant when I face challenges and struggles in school. I cannot help but feel great apprehension at the thought of him not being there everyday for my time in college.[8]

Mr. Arntsen has always been there for his daughter, as Sienna's mother Stefanie writes,

> When Sienna faced her own health struggles . . .it was Douglas who relentlessly supported me to seek out the best care to ensure she got the treatment she needed. I'll never forget how his quick thinking and preparedness saved the day when Sienna had a severe allergic reaction at a friend's Sweet 16 in Florida. We flew down as well to be at this party at a nearby hotel, just in case. His actions that day, like so many others, showed just how deeply he cares and how committed he is to our daughter's well-being.[9]

---

[7] The harsh effect of a parent's incarceration on his children has been acknowledged to be a relevant factor to be considered for sentencing under 18 U.S.C. 3553(a). See United States v. Isola, 548 Fed. Appx. 723, 725 (2d. Cir. 2013).
[8] Exhibit B: Letter by Sienna.
[9] Exhibit D: Letter by Stefanie Dispenza.

For Stefanie, a public school teacher, the period of COVID was especially difficult.  She not only had to take a six month leave from her job due to health complications caused by COVID, but then suddenly lost her beloved father to the pandemic illness, (he was only in his early 70s when he passed away).  But Mr. Arntsen, during these times, which overlapped with the offense conduct in this case, nevertheless was a reliable and compassionate partner:

> During that painful time, and while both my brother and I were battling in the hospital as well, Douglas was so supportive. He took care of everything for me, and even drove my mother, who struggles with dementia but of course insisted, to visit my father in the hospital, right up to his last day. It's these moments that truly show the measure of Douglas as a man; always thoughtful, always there when we need him most.[10]

The pandemic not only caused the death of Stefanie's father, but Mr. Arntsen's grandmother as well, who was in her early 90s when she passed away and who had to receive a painful funeral in which friends and family were restricted from attending or participating due to the enforcement of strict social distancing. Mr. Arntsen's father, Hans, writes,

> When my mother, Reidunn, passed away during the pandemic, Douglas was a comforting presence. He helped manage her care and took on many responsibilities for her funeral. During these challenging times, Douglas showed great strength and provided the support that kept our family stable.[11]

Mr. Arntsen has always maintained an especially close relationship with his parents, who have remained committed to their son through his trials and tribulations, just as they have been committed to themselves in a marriage entering its 50th year anniversary.  During the time Mr. Arntsen has remained on home detention for the

---

[10] Exhibit D: Letter from Stefanie Dispenza.
[11] Exhibit E: Letter from Hans Arntsen.

pendency of this case, he has lived with his parents.  His father writes, "Since being home under confinement, Douglas has obviously been more actively involved in our daily life. He helps with cooking, takes care of household tasks, and brings us closer together as a family. His presence and active involvement have been a source of joy and comfort for us all right now."[12]

Mr. Arntsen's mother, Annette, recognizes in her letter how her son has experienced both conflict and promise:

> Douglas's life has indeed been a journey of both significant missteps and meaningful contributions. Despite the values of honesty and responsibility we instilled in him, he strayed, impacting not only himself but also our community and, most profoundly, his family. The promises he broke, especially to his daughter Sienna who has faced her own health battles, weigh heavily on us all. Yet, it is through these challenges that Douglas has shown unwavering love and support, reflecting his deep commitment as a father.
>
> ***
>
> His actions that bring us here today were undoubtedly misguided, driven by poor judgment during a time of unprecedented global stress. But as a mother, it is incredibly painful to see him face the repercussions of his choices, but I remain hopeful in his ability to learn and grow.[13]

Mr. Arntsen's cousin, Lauren, writes:

> I hope that in considering Doug's case, you will see the man we know: a devoted family member, a caring father, and a person who brings comfort and strength to those around him, especially during difficult times.[14]

Additionally, a long-time family friend, Jose, who was an architect and former colleague of Mr. Arntsen's father, writes:

---

[12] Exhibit E: Letter from Hans Arntsen.
[13] Exhibit F: Letter from Annette Arntsen.
[14] Exhibit G: Letter from Lauren Posavetz.

> In the time I have known Doug, I have always known him to be a man of kindness, empathy and dedication. His actions reflect the values he was raised with and the person he strives to be every day. I firmly believe these qualities are crucial in understanding the person Doug is, beyond the current circumstances he faces.[15]

Another family friend, Margaret, writes: "Throughout the years, Doug has consistently shown himself to be a person with a big heart, always ready to assist and put others first."[16]

Beginning in September of 2022, through the date of his arrest, Mr. Arntsen was determined to undergo various rehabilitation measures. While he struggled with alcohol addiction himself, he worked and volunteered for Next Wind Recovery, helping others with their addiction struggles. The staff at Next Wind noted Mr. Arntsen's commitment to himself and others:

> In addition to his personal growth, Douglas has played a vital role in our community outreach programs. His significant contribution to organizing our charity events is a testament to his organizational skills and his commitment to helping others. Doug's decision to involve his daughter, Sienna, in volunteer work is not just a reflection of his family values but also his desire to instill the spirit of community service and resilience in the face of challenges. This action speaks volumes about his character and his approach to life and recovery.[17]

Subsequent to his arrest, Mr. Arntsen has devoted his time during his pretrial supervision to a non-profit organization called Our Place, in its Magenu division, which focuses on substance abuse counseling and rehabilitation in addition to other notable causes, such as Child Sexual Abuse prevention. The staff at Our Place, which

---

[15] Exhibit H: Letter from Jose Concepcion.
[16] Exhibit I: Letter from Margaret Tabbannella.
[17] Exhibit K: Letter from Alexis Brucato, Human Resources Manager at Next Wind.

has extended a job offer to Mr. Arntsen for even after this case and sentence concludes, wrote:

> Douglas has openly shared his remorse for the actions leading to his legal challenges. His sincere desire to amend his past mistakes and his dedication to serving the community are evident in his work with us. We recognize his potential for rehabilitation and his aspiration to make a significant impact.[18]

Earlier this year in February when Mr. Arntsen's pretrial services officer, P.O. Marlon Ovalles, referred him to attend classes at Focus Forward, another rehabilitative non-profit program, Mr. Arntsen committed himself to participating in its weekly counseling classes in a meaningful way to gain true value, rather than just merely showing up. The staff at Focus Forward wrote to the Court:

> Douglas exhibits his sincere commitment to our program. Each week he is the first person to join our class on Zoom, is the first student to email the assigned homework in advance of class, and he consistently thanks his classmates and us for the time we spend together. Douglas explained, "I see this opportunity as crucial steps towards personal growth and rehabilitation despite the challenges of my current situation."[19]

We respectfully ask the Court to consider Mr. Arntsen's genuine efforts to embrace rehabilitation, his compassionate nature towards others and his strong network of support, as mitigating factors in the determination of an appropriate sentence.

### III. MR. ARNTSEN'S PAST TRAUMA AND SUBSTANCE ABUSE ARE FURTHER MITIGATING FACTORS TO BE CONSIDERED FOR HIS SENTENCING

---

[18] Exhibit L: Letter from Eli Verschleiser, Chairman of Our Place.
[19] Exhibit M: Letter from Lori Fields, Class Facilitator at Focus Forward.

When Mr. Arntsen decided to retain Dr. Bardey, a Forensic Psychiatrist, he did so for two purposes: to present a science-based evaluation of himself to the Court for its consideration of a sufficient sentence, and, to initiate a long overdue process of professionally assisted self-reflection for his chronic issues of trauma and anxiety that have inflicted a detrimental influence on the course of his life. As noted by Dr. Bardey in his report, Mr. Arntsen had never before "engaged in formal mental health treatment of any kind."[20]  Mr. Arntsen attended at least eight in depth interviews with Dr. Bardey for purposes of his report, delving into all aspects of his life starting from childhood in a process that was both painful and rewarding, and Dr. Bardey additionally interviewed Mr. Arntsen's parents at length to gain additional context about his upbringing and character.

One of the most significant areas of Dr. Bardey's evaluation was an examination and diagnosis of trauma that Mr. Arntsen sustained from his prior incarceration in foreign and state prisons.  The report suggests a troubling and unfortunate reality of the criminal justice system:  that the impact of prison can be long lasting and not necessarily a deterrent for future conduct when it causes continued strife and demoralization that continues in the years after it is concluded.  The report's observations and conclusions suggest that the less than perfect system often leaves individuals ill equipped to reintegrate into society, and unprepared for the next crisis, which inevitably will always be just around the corner.  As Dr. Bardey notes:

> Finding himself at rock bottom, Mr. Arntsen made many attempts to financially support his family post-release, however, he felt "radioactive" and rejected by his old work acquaintances, and thus could not successfully secure employment. Isolated from friends and colleagues, Mr. Arntsen

---

[20] Exhibit C: Dr. Bardey's report, at page 4.

turned to acquaintances he made while in prison, for social
support, as he found other former inmates to be less judgmental
about his prior legal missteps. Ultimately, as a result of his
criminal conviction, Mr. Arntsen was disbarred in New York
state, and thus stripped of an important component of his
personal and professional identity.[21]

As Dr. Bardey recounts, the COVID crisis could not have come at a worse
time for Mr. Arntsen, inflicting on him and his family a major setback just as he was
starting to achieve a degree of financial and professional stability.  Unfortunately for Mr.
Arntsen, the financial and societal effects of the pandemic raised a sense of emergency
and desperation, for which he sought refuge in an unfortunate employment of bad
judgments and shortcuts.  As the report observes:

His success was short-lived as the COVID-19 pandemic
rapidly took over and destroyed what he had worked so hard to
achieve. Mr. Arntsen was forced to retreat to his residence and
was once again isolated from his community after successfully
establishing a comfortable lifestyle. Plunged for the second
time into isolation and uncertainty, reminded Mr. Arntsen of
the traumatic, lonely environment he experienced during his
incarceration, placing Mr. Arntsen right back into a constant
state of fear and anxiety. He was starting to let go of his
feelings of guilt and abandonment due to his absence from
2011 to 2015, but now his success was once again ripped away,
just as it had been before. Additionally, the pending threat that
resources were dwindling significantly exacerbated Mr.
Arntsen's already established anxiety regarding his family's
financial security. He found himself consumed by hours of
media content and believed that the United States economy
would inevitably crumble. When he discovered the Economic
Injury Disaster Loan (EIDL) program, Mr. Arntsen recognized
a pathway to financial security for his family.

Mr. Arntsen was soon able to secure several EID loans for
himself and those close to him. In addition to the obvious
financial reward, his involvement in the offense conduct served
him psychologically in several ways . . . His involvement gave
Mr. Arntsen newfound feelings of respect, likeability,
confidence, self-esteem, and even heroism. The ability for

---

[21] Exhibit C: Dr. Bardey's report, at page 5.

> people to set aside their judgements and request his guidance
> was exhilarating. He felt accepted, needed, important, and
> hopeful for his family's financial future. This combination of
> emotional fulfillment and financial security overwhelmed Mr.
> Arntsen's better judgment and contributed significantly to his
> ongoing involvement in the offense.[22]

But just as Mr. Arntsen has himself since recognized, such "newfound feelings of respect, likeability, confidence, self-esteem, and even heroism," were only a mirage of disillusion:

> Many endured similar pressures but chose not to compromise
> their ethics. They faced the same uncertainties without
> resorting to dishonesty or exploitation. Unlike them, I misused
> my knowledge for personal gain, fully aware of the
> wrongdoing yet proceeding nonetheless thereby diverting
> government assistance from those small businesses entitled to
> such loans. I should have known better and it is an
> understatement to say that I am greatly disappointed in
> myself.[23]

We respectfully ask the Court to consider Mr. Arntsen's conduct in the context of the observations noted in Dr. Bardey's report.  As Dr. Bardey concludes:

> It is my opinion, to a reasonable degree of medical certainty, that at the
> time of the instant offense, Mr. Arntsen's mental state was
> significantly impaired by his substance use and symptoms of anxiety,
> which significantly impacted on his judgment, thinking and decision
> making. The Court may wish to consider these psychological factors
> as mitigating in reaching an appropriate disposition in Mr. Arntsen's
> criminal case.[24]

---

[22] Exhibit C: Dr. Bardey's report, at page 12.
[23] Exhibit A: Letter from Douglas Arntsen.
[24] Exhibit C: Dr. Bardey's report, at page 14.

16

## IV. MR. ARNTSEN'S SENTENCING SHOULD BE IMPOSED IN CONSIDERATION OF SENTENCES FOR COMPARABLE COVID FINANCIAL FRAUD WITHIN THE SECOND CIRCUIT AND NATIONWIDE

We respectfully submit that an appropriate sentence for Mr. Arntsen is more sufficiently rendered when determined in the context of the times in which he committed his offense.  In this regard, we ask the Court to consider a term of imprisonment of 38 months, which is the length of incarceration that appears on the trendlines for other COVID-related financial fraud cases within the Second Circuit (Exhibit P), or less than 44 months, which is the term of imprisonment nationwide (Exhibit Q) with comparable loss amounts to 1.5 million dollars, for defendants with either prior convictions, Criminal History Category II or more, or post indictment offenses.

To begin, although the stipulated Guideline range in this case is 108 to 135 months, we submit that a variance below the Guidelines is justified here, and further, would not be unusual under these circumstances. For instance, the United States Sentencing Commission reports in its Statistical Information Packets for fiscal years 2020 – 2023 that variances have taken place in financial fraud cases in the Southern District of New York at rates of 71.6 percent in 2020, 66.3 percent in 2021, 70.9 percent in 2022, and 74.1 percent in 2023.[25]

Additionally, the PSR for Mr. Arntsen also notes:

---

[25] See Exhibit N containing the United States Sentencing Commission "Statistical Information Packets" for the Southern District of New York for the years 2020-2023, at pages 16 of each year's report.

that the Court may consider a sentence outside of the advisory
sentencing Guidelines range in order to provide for a sentence
that is sufficient, but not greater than necessary, pursuant to the
factors outlined in USC 3553(a). Specifically, the defendant's
prolonged history of alcohol abuse, specifically as it relates to
his decision-making, and his familial responsibilities, such as
providing transportation to his daughter, may be a variance
factors to consider for sentencing.[26]

The PSR additionally provides its own statistical analysis from 2018 -

2022 for a collection of 12 defendants who were reported to have their primary guidelines

calculated under Section 2B12.1, with a final offense level of 30 and Criminal History

Category of II.  The PSR states that the average length of imprisonment for those 12

defendants was 96 months, with a median length of 89 months.[27]

But the PSR, we submit, takes an overly restrictive approach in its focus

on only 12 defendants and a comparable offense level, rather than the much larger

sampling of defendants that we propose in the annexed charts that are particularized for

COVID related cases both within the Second Circuit and nationwide, with a larger

emphasis on the nature of loss amount in those cases.

We submit that the lower numbers set forth in the trendlines contained in

Exhibits P-Q reflect an acknowledgement by courts around the country that fraud during

COVID justified sentences that were still significant, yet lesser than those sentences

imposed for financial fraud committed during times of otherwise stability and order, or

those offenses directly impacting individual victims.

Additionally, the trendline for the 26 financial fraud cases sentenced by

this Court, (in Exhibit O), although not involving COVID related fraud, nonetheless

reflect sentences that are typically lower than what the Guidelines suggest for Mr.

---

[26] PSR, at ¶ 111.
[27] PSR, at Appendix A.

Arntsen's case.  More specifically, the trendline, as contained in Exhibit O, shows sentences at a range of 52 months when loss amounts have been $10 million or less, for Criminal History Category I offenders (appearing as blue dots on the chart) and those defendants with prior convictions or Criminal History Categories II or more, or post indictment offenses (which are noted as red dots on the chart).  For example, this Court sentenced Terry Former, in the matter of <u>United States v. Former</u>, 19Cr.00781 (PKC), to a prison term of 48 months after his guilty plea to conspiracy to commit wire fraud.[28] Former, who had Criminal History Category VI, "coordinated the opening and use of bank accounts used to receive more than $2 million in fraud proceeds as part of a business email compromise scheme."[29]

In another case, this Court sentenced Asa Saint Clair to 42 months in prison "for devising a fraudulent investment scheme in which he tricked at least 60 victims into providing loans to his organization, the World Sports Alliance, tried to a purported digital coin offering."[30]  In that case, entitled <u>United States v. Saint Clair</u>, 19Cr.00790 (PKC), Saint Clair, who was found to be at a Criminal History Category II, faced a sentencing range under the Guidelines of 97-121 months for a loss amount of $600,000 and a base offense level of 29.[31]  Additionally, the defendant in Saint Clair did not promptly accept responsibility like Mr. Arntsen, but was instead found guilty after a trial in which he testified in a manner that the Government described as an "obstruction of justice" for lying to the jury.[32]

---

[28] See DOJ press release at https://www.justice.gov/usao-sdny/pr/texas-man-sentenced-48-months-prison-laundering-proceeds-multimillion-dollar-business.
[29] See Government's sentencing memorandum in <u>Former</u>, at *ECF* 165.
[30] See DOJ press release at https://www.justice.gov/usao-sdny/pr/president-sham-united-nations-affiliate-sentenced-42-months-prison-cryptocurrency.
[31] See Government's sentencing memorandum in <u>Saint Clair</u>, at *ECF* 115.
[32] Id.

19

In <u>United States v. Stasiv</u>, 18Cr.00259 (PKC), this Court imposed a combined sentence of 84 months following a conviction after trial for a scheme to defraud banks and check-cashing stores in the amount of $548,128.70.[33]  In that case, the defendant, who was determined to be Criminal History Category III, was convicted after a jury trial of three counts including wire fraud, aggravated identity theft and conspiracy to commit bank fraud, consisting of two separate criminal schemes.[34]

Additionally, with respect to those prosecutions particularly for COVID related financial fraud in other district courts within the Second Circuit, there have been other cases that we submit are notable for purposes of comparison to Mr. Arntsen's case, (and contained in the chart under Exhibit P).

For instance, in <u>United States v. Kukaj</u>, 20Cr.00660 (ALC), defendant received a 57-month prison sentence imposed by Judge Andrew L. Carter, Jr., for "orchestrating a sprawling loan fraud scheme."[35]  Although the defendant in that case was adjudicated as a Criminal History Category I, he was also convicted of fraudulently seeking $6.14 million of COVID EIDL and PPP loans during the pandemic, which he separately perpetrated while on pretrial release, and which the Government described as "an astonishing sequence of criminal conduct: threats, pandemic loan fraud that sought at least $6.4 million and netted him $1.5 million . . . despite the fact that he was on bail [for bank fraud]."[36]

---

[33] See DOJ press release at https://www.justice.gov/usao-sdny/pr/ukrainian-man-sentenced-manhattan-federal-court-84-months-prison-role-check-fraud.
[34] See Government's sentencing memorandum in <u>Stasiv</u>, at ECF 258.
[35] See DOJ press release at https://www.justice.gov/usao-sdny/pr/restaurateur-sentenced-57-months-prison-over-6-million-pandemic-loan-fraud-and#:~:text=Damian%20Williams%2C%20the%20United%20States,at%20least%20%246.14%20million%20and.
[36] Id.  See also, Government's sentencing memorandum in <u>Kukaj</u> , at *ECF* 406.

In the case of <u>United States v. Leon Miles</u>, 21Cr.00221 (BMC), Judge Brian M. Cogan in the Eastern District of New York sentenced the defendant, who was determined to be Criminal History Category V, to 72 months imprisonment for making false statements in an application for a COVID PPP loan in an amount over $1.9 million.[37]

In <u>United States v. Johnson</u>, 22Cr.00030 (LEK), the defendant, at a criminal History Category II, received a sentence of 41 months in the Northern District of New York for filing false unemployment insurance applications in a conspiracy to commit mail fraud by fraudulently obtaining $701,441 in benefits in the names of other people during the pandemic.[38]

Many of the sentences imposed in cases involving COVID related financial fraud across the nation (appearing in the chart under Exhibit Q) also support a significant variance for Mr. Arntsen's sentence.  Some notable cases include the following.

In <u>United States v. Harrison</u>, 21Cr.20510, in the Eastern District of Michigan, the defendant received a sentence of 60 months imprisonment for fraudulent schemes of filling false unemployment insurance claims using other people's identities, for a loss amount of $6,920,388, and Criminal History Category III.[39]

In another fraudulent unemployment application scheme, in <u>United States v. Anthowan Daniels</u>, 22Cr.00097, in the Eastern District of Virginia, the defendant

---

[37] See DOJ press release, at https://www.justice.gov/usao-edny/pr/brooklyn-man-sentenced-72-months-prison-19-million-paycheck-protection-program-fraud.  See also, Government's sentencing memorandum in <u>Miles</u>, at *ECF* 33.

[38] See DOJ press release, at https://www.justice.gov/usao-ndny/pr/albany-resident-sentenced-41-months-unemployment-insurance-fraud. See also, Government's sentencing memorandum in <u>Johnson</u>, at <u>ECF</u> 65.

[39] See DOJ press release, at https://www.justice.gov/usao-edmi/pr/fifteen-people-sentenced-defrauding-unemployment-insurance-agencies-during-covid-19.  See also, Government's sentencing memorandum in <u>Harrison</u>, at ECF 249.

received a sentence of 42 months with Criminal History Category VI and a loss amount of $3.5 million during COVID, which included pleading guilty to possession of a firearm.[40]

In United States v. Andre Clark, 21Cr.60029, in the Southern District of Florida, the defendant had a Criminal History Category of II with a total loss amount of $7,263,564, for which he applied for fraudulent PPP loans on behalf of his own company and many more loans through other conspirators.[41]  He received a sentence of 33 months imprisonment.

In United States v. Shittu, 22Cr.00202, in the Northern District of California, the defendant received a sentence of 30 months for fraudulently obtaining pandemic-related unemployment benefits in the names of other people for a loss amount of $2,200,000 and Criminal History Category II.[42]

And in United States v. Bennett, 22Cr.00489, in the District of New Jersey, the defendant was convicted of bank fraud conspiracy and wire fraud, and one count of being a felon in possession of a firearm, and received a sentence of 41 months imprisonment, relating to his submitting a fraudulent PPP application and then seventy-four fraudulent unemployment insurance claims, with a restitution ordered in the amount of $942,141.[43]

---

[40] See DOJ press release, at https://www.justice.gov/usao-edva/pr/former-federal-employee-sentenced-leading-35-m-unemployment-insurance-fraud-scheme.  See also, Government's sentencing memorandum in Daniels, at *ECF* 18.

[41] See DOJ press release, at https://www.justice.gov/usao-sdfl/pr/man-sentenced-covid-19-relief-fraud. See also, Government's sentencing memorandum in Clark, at *ECF* 42.

[42] See DOJ press release, at https://www.justice.gov/usao-ndca/pr/castro-valley-resident-sentenced-2-12-years-prison-connection-prolific-pandemic-relief.  See also, Government's sentencing memorandum in Shittu, at *ECF* 63.

[43] See DOJ press release, at https://www.justice.gov/usao-nj/pr/camden-county-resident-sentenced-41-months-prison-defrauding-covid-19-relief-programs-and.

We hope that these examples, and the collection of cases contained in the annexed Exhibits O-Q, can assist the Court in justifying a sentence for Mr. Arntsen that is below the Guidelines, for a term of 38 months imprisonment.

## V.  **CONCLUSION**

For the foregoing reasons, we respectfully request on behalf of Mr. Arntsen a sentence of 38 months imprisonment, which we submit is a sufficient but not greater than necessary sentence to comply with the purposes set forth in 18 U.S. § 3553(a).

Additionally, it is respectfully requested that as part of its sentence, the Court direct the Bureau of Prisons to provide Mr. Arntsen with residential substance abuse treatment (RDAP) to address his alcohol issues, to recommend a designation to Federal Correctional Institution Lewisburg where such programs are known to exist, and to permit Mr. Arntsen to self-surrender to such facility.

Dated: New York, New York
       April 18, 2024

_____s/_____
Aaron M. Rubin, Esq.

99 Wall Street Suite 1130
New York, New York 10005
Tel.: (212) 725 - 4600
arubin@amresquire.com
*Counsel for Douglas Raymond Arntsen*