

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 24, 2024

**BY ECF**
The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

    Re:    <u>United States v. Douglas Raymond Arntsen</u>, 23 Cr. 568 (KPC)

Dear Judge Castel:

    The Government respectfully submits this letter in advance of sentencing in this matter for defendant Douglas Raymon Arntsen (the "defendant"), which is scheduled for April 16, 2024. On December 14, 2023, the defendant pled guilty pursuant to a plea agreement (the "Plea Agreement") to one count of conspiracy to commit wire fraud, in violation of Title 18, United States Code, Sections 1349. The defendant, falsely claiming to be a lawyer, recruited at least 13 co-conspirators into a scheme that defrauded the Small Business Administration ("SBA") out of more than $1.5 million. The defendant did so just five years after getting out of prison for orchestrating a scheme to steal $10 million from the escrow accounts of his law firm's clients. Given the sizeable and sprawling nature of the defendant's fraud and the need to deter him from committing future frauds, the Government recommends the Court impose a sentence within the Guidelines range of 108 to 135 months' imprisonment.

    **A.  Overview**

        i.  <u>The Offense Conduct</u>

    Between June 2020 and August 2020, Arntsen masterminded a scheme to defraud the SBA out of more than $1.5 million. (PSR ¶ 16). In total, he recruited at least 13 people into his scheme. (PSR ¶ 16). Arntsen would recruit people who were struggling financially, but otherwise had good credit and no criminal history. (PSR ¶ 16).

    Arntsen's co-conspirators trusted him because they thought he was a lawyer. (PSR ¶ 16). In reality, he had been disbarred. (PSR ¶ 16). Arntsen promised his co-conspirators a way out of their difficult financial circumstances. (PSR ¶ 16). All they had to do, Arntsen would promise them, was give him their personal information, and he would use that information to apply for Economic Injury Disaster Loans ("EIDL")—loans that were meant for small businesses struggling in the face of a global pandemic. (PSR ¶¶ 12, 16). Arntsen would encourage his co-conspirators

to act quickly. As he wrote one co-conspirator, "My concern is they are depleting funds by the day and I want you in." (PSR ¶ 16).

Once Arntsen had the personal information of his co-conspirators—including their social security and driver's license numbers—he submitted EIDL applications on their behalf, falsely claiming the co-conspirators owned businesses with large revenues. (PSR ¶ 17). In reality, these businesses had little to no revenue, and, often, the applicants had no connection to the businesses. (PSR ¶ 17).

To take one example, a co-conspirator reached out to Arntsen, desperate for help with "crazy [car] payments [the co-conspirator couldn't] afford." (PSR ¶ 18). Arntsen responded, "[t]here may be a way," and then asked for the co-conspirator's credit score. (PSR ¶ 18). Shortly thereafter, he had applied for a loan, falsely claiming that the co-conspirator had a business with $446,000 in revenue. (PSR ¶ 18).

Throughout, Arntsen was the mastermind of this scheme and central to its success. (PSR ¶ 19). He would give his co-conspirators detailed talking points, so that they would be prepared should the SBA call with diligence questions. (PSR ¶ 19). For example, he told one co-conspirator to falsely claim, among other things, that the co-conspirator owned "a home improvement and design company" that was "[f]ormed in Delaware in August 2011." (PSR ¶ 19).

Arntsen and his co-conspirators enriched themselves through the scheme. (PSR ¶ 20). Sometimes Arntsen would keep the entirety of the loan proceeds and give his co-conspirator a cut; other times Arntsen would do the opposite, taking a commission for helping the co-conspirator obtain the fraudulent loan. (PSR ¶ 20). After one fraudulent loan was approved by the SBA, Arntsen texted a co-conspirator, "Need how you want your bank checks. Your chariot has arrived." (PSR ¶ 20).

Arntsen would also work with his co-conspirators to find additional recruits. He told one co-conspirator, "[g]et me one more warm body." (PSR ¶ 21). The co-conspirator then gave Arntsen the personal information of a relative, which Arntsen used to obtain an additional loan. (PSR ¶ 21).

Arntsen also used the personal information of co-conspirators and their family members without their permission to obtain hundreds of thousands of dollars of loans from the SBA. (PSR ¶ 22). He kept the proceeds for himself, and the co-conspirators and their family members were saddled with loans they could not afford to pay back. (PSR ¶ 22).

Arntsen also obtained hundreds of thousands of dollars of fraudulent loans using his own identity and personal information, falsely claiming to own companies with many hundreds of thousands of dollars of revenues. (PSR ¶ 23).

The scheme was highly sophisticated. To take one example, Arntsen covered his tracks using virtual private networks, allowing him to mask the internet protocol address he had used to apply for the fraudulent loans. (PSR ¶ 24). And he directed his co-conspirators to create an elaborate web of shell companies and open bank accounts connected to those shell companies.

(PSR ¶ 24). Once the fraudulent loan proceeds had been deposited into the accounts, Arntsen would have co-conspirators withdraw the funds in cash, further obscuring his involvement in the fraud. (PSR ¶ 24).

In total, Arntsen and his co-conspirators obtained $1,430,200 in fraudulent loans, and attempted to obtain hundreds of thousands of additional fraudulent loans that the SBA declined to fund. (PSR ¶ 27).

### ii. Procedural History

The defendant was arrested on November 7, 2023, and bailed. On December 14, 2023, pursuant to the Plea Agreement, the defendant pled guilty to one count of conspiracy to commit wire fraud, in violation of Title 18, United States Code, Sections 1349.

In the Plea Agreement, dated December 1, 2023, the parties stipulated to a United States Sentencing Guidelines (the "Guidelines") range of 108 to 135 months' imprisonment (the "Guidelines Range"), based on an Offense Level of 30 and Criminal History Category of II. (PSR ¶ 7). The United States Probation Office ("Probation") agrees with this calculation. (PSR ¶ 93).

## B. Discussion

### i. Applicable Law

As the Court is well aware, the Guidelines continue to provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596.

After that calculation, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6. To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 46).

Although the Court may not presume the reasonableness of a within-Guidelines sentence, the Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

    ii.  The Court Should Impose a Sentence within the Guidelines Range

A sentence within the Guidelines range of 108 to 135 months' imprisonment is warranted in this case, particularly to reflect the nature and seriousness of the offense, ensure deterrence, and protect the public from future frauds committed by the defendant.

The defendant's crimes were extremely serious. He orchestrated a scheme to defraud the SBA out of more than $1.5 million. The money Arntsen stole was meant to assist businesses struggling with the effects of the pandemic. It was not meant to enrich fraudsters for personal gain. Artnsen's scheme was sprawling and sophisticated, involving at least 13 co-conspirators and a large number of shell companies. Throughout, Arntsen was the mastermind. It was Arntsen who recruited the co-conspirators, and encouraged them to involve their friends and relatives in the fraud. It was Arntsen who gave his co-conspirators detailed talking points on how to lie to the SBA. It was Arntsen who applied for the loans. It was Arntsen who created the shell companies. And it was Arntsen who directed his co-conspirators to open bank accounts connected to those shell companies.

Throughout, Arntsen deceived his co-conspirators. He held himself out as a lawyer, even though he was not. While the co-conspirators were willing participants in the scheme, they trusted Arntsen, believing that, as a lawyer, he would not get them involved in illegal activity. They were wrong.

And while the co-conspirators did benefit monetarily from the scheme, they were also victims. Arntsen targeted people that were going through tough times, preying on their vulnerability. And after Arntsen had helped his co-conspirators obtain loans, he used their personal information to apply for more loans without the co-conspirators' permission, saddling them with hundreds of thousands of dollars of debt. Arntsen would tell the co-conspirators to trust him, promising them that it would all be okay. Instead, the co-conspirators now face years of loan repayments that they cannot afford.

Arntsen did what he could to ensure that his co-conspirators would also face the brunt of law enforcement scrutiny. He applied for the loans under their names, and he used virtual private networks to hide the fact that he was the one applying for the loans. And then he ensured that, in the first instance, he would not touch the money, having his co-conspirators open bank accounts, make the wire transfers, and withdraw cash.

The seriousness of the offense here counsels for a substantial sentence of imprisonment, as does the need for deterrence and to ensure the safety of the public. The reality is that the defendant is a prolific fraudster. And he has not been deterred by past sentences of imprisonment. In 2012, the defendant was sentenced to four to 12 years' imprisonment, ultimately serving just over two years. (PSR ¶ 24). While Probation requested, but did not receive, records related to this conviction, the Government was able to find more information through public sources. The defendant's 2012 conviction was highly publicized. According to news reports, the defendant, then a barred lawyer working for Crowell & Moring, pled guilty to engaging in a multi-year scheme to steal more than $10 million in clients' money from escrow accounts, spending the

money on pricey restaurants, strip clubs, and buying businesses.[1]  At the time, the defendant was making $220,000 annually, but he was not satisfied: he wanted to make millions the easy way, through theft.

Even after serving more than two years in prison for this offense, the defendant was not deterred.  Just five years later, he engaged in the instant scheme to defraud the SBA out of more than $1.5 million.  It is notable that the defendant was well into his 30s when he committed these offenses, showing that he has not aged out of crime.  Far from it.  By all accounts, the defendant turned to a life of crime for one reason only—greed.

The defendant's repeated criminal conduct occurred despite having two loving, supportive parents and having the benefit of a first-rate education, including a law degree.  Instead of using his credentials to open doors, the defendant used them to commit crimes.  Indeed, even today, the defendant appears to be doing legal work and possibly holding himself out to be a lawyer, doing work reviewing contracts for a New York law firm, Gulko Schwed.  (PSR ¶ 16).  That in and of itself is deeply concerning.

The defendant's commitment to his daughter is to be commended.  But there is no reason to believe that it would lead him to abide by the law.  The defendant's commitment to his daughter did not stop him from embezzling $10 million of client funds in 2012, and it did not stop him from defrauding the SBA out of $1.5 million in 2020.  The defendant committed these crimes at the prime of his daughter's childhood, despite having a strong support system and every reason to live a law-abiding life.

Because the defendant's history strongly suggests will turn back to a life of crime, of trying to make money the easy way, a substantial prison sentence is necessary to deter the defendant and protect the public.

C. Conclusion

For the reasons set forth above, a sentence within the Guidelines range of 108 to 135 months' imprisonment is appropriate.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by:  /s/
Adam Sowlati
Assistant United States Attorneys

---

[1] Joseph Ax, NY lawyer pleads guilty to stealing $10 million from clients, Reuters (Oct. 2, 2012), available at https://www.reuters.com/article/idUSBRE89200H/.

(212) 637-2438

cc: Defense Counsel (by ECF)